

FILED
May 26 2015, 9:13 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Norman L. Roelke
Fort Wayne, Indiana

ATTORNEYS FOR REVIEW BOARD
OF THE INDIANA DEPARTMENT OF
WORKFORCE DEVELOPMENT

Gregory F. Zoeller
Attorney General of Indiana

Graham T. Youngs
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR A.W. HOLDINGS,
LLC

Adrienne C. Romary
Carson Boxberger LLP
Fort Wayne, Indiana

Ragna M. Urberg
A.W. Holdings, LLC
Fort Wayne, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

James E. Reed,

*Appellant*,

v.

Review Board of the Indiana
Department of Workforce
Development, and A.W.
Holdings, LLC,

*Appellees*.

May 26, 2015

Court of Appeals Case No. 93A02-1410-EX-745

Appeal from the Review Board of the Indiana Department of Workforce Development

The Honorable Steven F. Bier, Chairperson

Case No. 14-R-01807

**Brown, Judge.**

[1] James E. Reed ("Employee") appeals a decision by the Review Board of the Indiana Department of Workforce Development (the "Board") denying his claim for unemployment benefits. Employee raises two issues, which we revise and restate as whether the record supports the Board's decision. We reverse.

*Facts and Procedural History*

[2] Employee was employed by A.W. Holdings, LLC, ("Employer") as a direct support professional and provided support and assistance to individuals with developmental disabilities. Employer provided day habilitation services for disabled individuals or clients.

[3] On May 7, 2014, Employee was driving three of Employer's clients back to Employer's location after visiting a park and the library when one of the clients in the vehicle ("Client D," as he is referred to in the record), began to yell and then to beat his chest with his fists. Employee pulled the vehicle to the side of the road near a busy intersection, had the two clients who had not become upset exit the vehicle, and required Client D to remain inside the vehicle. Employee attempted to call two supervisors, was unable to reach them, and then called a co-worker who was able to contact Employee's supervisor. Employee's supervisor then called Employee, asked if the clients were out of the car safely, and stated that she would send help. Antonia Gatewood, a residential manager for Employer, was sent to assist Employee. When Gatewood arrived at the scene, she observed that Client D was inside the

vehicle and that Client D was yelling. Gatewood had Employee unlock the door, Client D exited the vehicle and was upset with Employee, and Gatewood walked Client D to her vehicle. Employee's last day of work was May 7, 2014, and his employment was terminated effective May 12, 2014.

[4] Employee filed a claim for unemployment benefits, and a deputy for the Department of Workforce Development issued a determination that Employee was not discharged for just cause. Employer appealed the deputy's determination, and a telephonic hearing was held before an administrative law judge (the "ALJ") on August 21, 2014, at which testimony was heard from Employee, Joy Dennison, a human resources recruiter for Employer, and Bree Cannon, an assistant director for a day care center for Employer. Employer submitted documentary evidence which included professional conduct rules, an incident report prepared by Gatewood on May 8, 2014, certificates given to Employee in September 2014 and December 2014 for completing certain student training, the job description for the position of a direct support professional, a printout of a webpage showing the temperature inside a car over time when the outside temperature is ninety degrees, and an employee disciplinary report signed by Cannon as Employee's supervisor on May 12, 2014. The document with the subject line "Professional Conduct," stated under Paragraph A: "Employees of [Employer] will in no way exploit, neglect or inflict physical or psychological harm on a client." Exhibits at 18. Employer submitted an acknowledgement of Employee that he received a copy of the professional conduct policy in July 2011. The written job description for the

position of direct support professional included a paragraph of general responsibilities, twenty-five numbered specific responsibilities, and two additional requirements for professionals working with individuals who have a behavior support plan (a "BSP"), namely, to "[c]omply with behavior support policies and procedures, and implement approved BSP" and to "[p]rovide positive behavior supports according to individual BSP's [sic] and respond to emergency situations as trained." *Id.* at 27. The disciplinary report signed by Cannon included a box for "Termination," which had been marked, following the word "Action." *Id.* at 37. Following the phrase "Nature of Incident" on the report, a box for "Violation of Company Rules" was marked. *Id.* In a space for "Details of Incident/Performance Issue," the disciplinary report stated:

> On 5/7/2014 it was reported that [Employee] had failed to provide appropriate support for a consumer he was serving in the community. Upon further investigation [Employee] disclosed that he had tried to keep his consumer safe by containing him in his vehicle. [Employee] neglected to follow this consumer's [BSP] or to implement MANDT de-escalation techniques, as trained, in response to his client who was exhibiting maladaptive behaviors. This action violates [Employer's] Professional Conduct Policy which states in letter A, "Employees of [Employer] will in no way exploit, neglect or inflict physical or psychological harm on a client." This is also a violation of [Employer's] Direct Support Professional Job Description that states that DSP's must, "Comply with behavior support policies and procedures, and implement approved BSP" and "Provide positive behavior supports according to individual BSP's [sic] and respond to emergency situations as trained."
>
> In addition to this incident, [Employee] received one other disciplinary report on 11/20/2013 for failing to provide documentation as assigned.
>
> As a result of his neglectful actions, [Employee] is being terminated effective immediately.

*Id.* Employee submitted exhibits which included a daily activity log, Employee's written statement, and a drawing showing the location of his parked car relative to the surrounding streets and the clients at the time of the incident.

[5] Cannon testified that Gatewood witnessed the event on May 7, 2014, that Gatewood was not available to testify, and that Gatewood's written statement of May 8, 2014, had been submitted. In her written statement, Gatewood said that she received a call to help with Client D, who was "having a behavior," and "the staff needed assistance." *Id.* at 20. She stated that, after she arrived, she "hear[d] a horn being blown and saw someone outside the car" and "when [she] got out [she] went up to the car to see [Client D] inside the car with the windows up and his jacket on and yelling." *Id.* She stated that Employee "had his car keys in the passenger door lock to keep [Client D] from getting out," that she "told [Employee] to let him out and unlock the door," that "[a]s [Employee] started to unlock the door, [t]he other client that was outside tried to get into [Gatewood's] car on the street side," and that she "ran out to get him and guided him back to the sidewalk." *Id.* She further stated that, after helping the client, she "went back to [Employee] to notice he still did not unlock the door or let [Client D] out of the hot car" and that she told Employee "to unlock the car now." *Id.* Gatewood stated that, as Employee did so, she told Client D that he was going home with her. She also stated that, "[a]s [Client D] was getting out of the car he was very upset at" Employee and "was yelling and cursing at him," she "walked [Client D] over to [her] car," Employee had the

other clients enter his vehicle, Client D "did not get into [Gatewood's] car until [Employee] was gone," and that once Employee was gone, she and Client D left for the group home. *Id.* at 21.

[6] Cannon testified that she spoke to Employee on May 8, 2014, and that he had responded affirmatively when asked if he had locked a client in a car and if the car was hot. She testified that Employee indicated that he thought he was keeping the client safe. She testified that Employee said Client D "was upset so he had redirected the other client[s] out of the car and contained [Client D] in the car." Transcript at 11. She further testified that Employee stated that Client D "was upset because he thought another client that was with them had taken his library bag." *Id.* When asked if her policies in any way allow for physical restraint or confinement of clients, Cannon testified: "Physical restraint, yes. Confinement of clients, no." *Id.* Cannon testified that she was not aware of other employees who engaged in conduct similar to Employee's conduct and that, if she were aware of such conduct, that employee's employment would also be terminated.

[7] When asked what Employee "was supposed to do," Cannon testified that "[h]e should've followed Mandt, which he should have used, he should have taken [Client D] out of the car and he should have used a Mandt hold." *Id.* at 12. She testified a "Mandt hold, maybe you would refer to that as restraint" and that "[y]ou would never . . . seclude someone in a hot car." *Id.* She indicated that, even if it had not been hot, it would not have been appropriate to lock Client D in a car because "we do not seclude people." *Id.* at 13. When asked

what might have happened if he locked an angry client in a car, Cannon said "he could've died" and "[i]t was very hot that day." *Id.*

[8] Dennison testified that the certificates submitted by Employer show that Employee received "basic Mandt training" and "intermediate Mandt that is a little bit more" and "[i]t teaches more on the holds that [] Cannon was talking about." *Id.* at 14.

[9] Employee testified that on May 7, 2014, he was engaging with Client D. When asked if he locked Client D in a car, Employee indicated that "[t]he keys were in the car on the passenger side in the front door," that he did not lock Client D in the car, and that the client "had been pushing the door open and I was letting him open it in order to get him fresh air." *Id.* at 18-19. He testified that Client D "would be pushing the car door out towards me and he was able to, in order to prevent him from getting hurt, I, he opened the door so far, he got fresh air and that, and we did that for off and on for twenty minutes." *Id.* at 19. When asked, "[s]o other than allowing him fresh air, was he confined to the car," Employee responded affirmatively. *Id.* When asked the temperature, Employee said "roughly around eighty-four to eighty-six degrees that day" outside the car. *Id.* When asked "was it hotter than eighty-four degrees inside the car," Employee replied "I would say much hotter due to his activities within the car." *Id.*

[10] Employee testified that he had "two other consumers on the outside of the car," that "[o]ne consumer if not closely supervised would have been running up and

down and possibly may have gotten hit by a car," that Client D "was what we would . . . call a runner," and that "[w]hen he got out of the car he would've been into the traffic and somebody could've died that day." *Id.* Employee testified that the behavior started at 2:24 p.m., that he pulled off the road at 2:25 p.m., that he notified his supervisor at 2:25 p.m., that he called a second supervisor at 2:26 p.m., and that neither responded. Employee testified that the behavior started with Client D "just yelling" and that, within two minutes, the client "started to beat his chest, doing with both fists, stating that he would fight," that "in past experiences, when he gets to this stage, he will start to hit people," and that Employee pulled the car over to avoid "being in an accident in case [he] got hit" and "got to [sic] individuals out of the car safely." *Id.* at 20. When asked if the other two clients in the car were flight risks, Employee said that one of them had "a track record and history of it." *Id.* When asked about Client D's height and weight, Employee stated Client D was "[a]bout five five, five six" and weighed "[b]etween a hundred and seventy-five to maybe a hundred and eighty-five." *Id.* Employee testified that, at 2:35 p.m., he called a co-worker, who contacted Employee's supervisor. He testified that his supervisor called him back at 2:38 p.m., his supervisor asked "did you get the other two out safely," he said "yes," and that the supervisor said "I'll send help." *Id.* He further testified that assistance arrived at 3:00 p.m., and that the car was stopped three houses from "one of the heaviest traveled intersections in Fort Wayne." *Id.* at 21.

When asked if he considered calling the police, Employee said "no" and that he had "to go through a supervisor" to do so. *Id.* He stated that Client D had a history of fighting and running, and that, in 2012, there was a "violent episode at the workshop" and "while [h]e was trying to protect a staff member," Client D "punched [him] in the face and then bit [him] in the back." *Id.* at 22. Employee also testified that he gave Client D water while he was in the car. When asked if he knowingly failed to follow Client D's BSP, Employee replied "[n]o, I did not fail to follow it." *Id.* at 26. When asked if he knew that physically restraining Client D was an option, Employee replied "I am five foot four, sixty-two years old" and "I could not physically do it." *Id.* Employee testified "[a] supervisor must give permission and a Mandt hold cannot be used longer than three minutes, which would've then endangered the other two clients." *Id.*

Employee indicated that he was unable physically to restrain Client D and that, the last time he was involved in a physical restraint of the individual, "it took two people to physically restrain him with . . . supervisor permission . . . and it was all both of us could do is to hold him." *Id.* When asked why he did not permit Client D out of the vehicle and keep the other two clients in the car with the windows down or air conditioner on, Employee testified "[f]irst hand knowledge of his running" and that he "would never [have] been able to keep up with them as I cannot run any longer." *Id.* at 27. When asked "[d]oes the intermediate Mandt teach holds and blocking to keep a consumer from running

away," Employee replied that "Mandt[] is taught in order to use only if the individual is endangering to hurt someone else or himself." *Id.*

[13] Cannon testified that Client D and one of the other clients were flight risks and that Client D has a history of physical aggression. She stated that Employee did not require permission to call the police and that she would have allowed him to call the police. She also testified that Employee did not need authorization from a supervisor to perform Mandt. When asked, if Client D "had gotten away" from Employee and ran, "could [Employee] have chased him down," Cannon replied "I have no idea." *Id.* at 31-32.

[14] Employee then testified that he was not aware of any direct support person ever being allowed to call the police in the community. When asked whether Employer had given him any written documentation of directives that prohibited him from calling the police, Employee answered that "[t]here is no documentation on . . . using the police either way." *Id.* at 33. Employee testified: "I chose to keep, to do the best I could under the circumstances because I did not want to live the rest of my life knowing that I caused someone's death because they were in a behavior and got hit by a car." *Id.* at 34.

[15] In a closing statement, Dennison said that Employee could have at any time called 911, that Employer has "several individuals that have behaviors," and "that is why we use the Mandt system" and "have the behavior support plan." *Id.* She said that Employee "chose to not use either one" and to lock a

consumer in a hot car, that she understood that Employee "thought it was safer to not let the client get hit, but you also don't lock them in a car at ninety degree temp with the possibility of a heat stroke," and that if Employee "would've just followed the plan, did what he was taught, or called 911, then this situation would've been different." *Id.* at 34-35. In his closing statement, Employee stated that he "did the best [he] could under the circumstances of keeping people safe with no help until thirty-five minutes after this incident started" and that he "did not want . . . to have on [his] conscious [sic] that one or two people were seriously injured or might've been killed by an oncoming car." *Id.* at 35.

[16] The ALJ entered a decision on August 21, 2014, reversing the deputy's determination and finding that Employer discharged Employee from employment for just cause in connection with work and that Employee is ineligible to receive unemployment benefits. In its decision, the ALJ found in part:

> [Employer] employed [Employee] as a direct care professional. [Employer's] written rule prohibits client neglect. [Employee] received the rule on July 05, 2011.
>
> On May 07, 2014, [Employee] drove three clients in an automobile to complete errands. [Client D] became upset, complaining that another client took his library book bag. [Client D] was an escape risk. [Client D] had a history of aggressive behavior, and in fact in the past had punched and bit [Employee]. [Client D] began beating his own chest, an indication that [he] was about to become physically violent.
>
> Had [Client D] become physically violent, [Employee] would have been unable to restrain him. Likewise, had [Client D] attempted to flee, [Employee] would have been unable to restrain him. The incident took place at the intersection of two busy city streets. One of the remaining clients was also an escape risk. In order to prevent

[Client D] from attacking others, and to prevent the two clients who posed an escape risk from running into traffic of a busy intersection, [Employee] removed the other clients from the automobile, and confined [Client D] in the automobile.

The temperature outside the automobile was 84 degrees Fahrenheit. The temperature inside of the automobile exceeded 90 degrees Fahrenheit.

[Employee] did not call the police to assist with [Client D]. [Employee] testified that [Employer's] policy prohibited him from calling the police without the approval of a supervisor. [Employer] never provided [Employee] with a written policy that prohibited him from calling the police without the approval of a supervisor. [Employer's] witness denied that [Employer's] policy prohibited [Employee] from calling the police without the approval of a supervisor. [Employer's] policy did not prohibit [Employee] from calling the police without the approval of a supervisor.

The purpose of the rule is to prevent neglect of the [Employer's] disabled clients.

[Employer] would discharge all employees who violate the rule.

* * * * *

[Employee] received the rule on July 05, 2011. [Employee's] subsequent violation would be a knowing violation of the rule.

* * * * *

[Employee] is ineligible to receive unemployment insurance benefits.

Exhibits at 42-44. Employee appealed from the decision of the ALJ, and the Board issued a decision which adopted and incorporated by reference the decision of the ALJ and affirmed the ALJ's determination. Employee appeals the decision of the Board.

*Discussion*

[17] The issue is whether the record supports the Board's decision that Employee was discharged for just cause. The standard of review on appeal of a decision of the Board is threefold: (1) findings of basic fact are reviewed for substantial evidence; (2) findings of mixed questions of law and fact—ultimate facts—are reviewed for reasonableness; and (3) legal propositions are reviewed for correctness. *Recker v. Review Bd. of Ind. Dep't of Workforce Dev.*, 958 N.E.2d 1136, 1139 (Ind. 2011) (citing *McClain v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d 1314, 1318 (Ind. 1998), *reh'g denied*). Ultimate facts are facts that involve an inference or deduction based on the findings of basic fact. *Id.* (citing *McClain*, 693 N.E.2d at 1317). Where such facts are within the special competence of the Board, this court will give greater deference to the Board's conclusions, broadening the scope of what can be considered reasonable. *Id.* (citing *McClain*, 693 N.E.2d at 1318).

[18] In Indiana, an employee is ineligible for unemployment benefits if he or she is discharged for just cause. *Stanrail Corp. v. Review Bd. of Dep't of Workforce Dev.*, 735 N.E.2d 1197, 1202 (Ind. Ct. App. 2000), *trans. denied*; Ind. Code § 22-4-15-1.[1] Ind. Code § 22-4-15-1(d) provides that "[d]ischarge for just cause" is defined

---

[1] At the time of Employee's discharge, Ind. Code § 22-4-15-1(a) provided in part:

> [A]n individual who has voluntarily left the individual's most recent employment without good cause in connection with the work *or who was discharged from the individual's most recent employment for just cause* is ineligible for waiting period or benefit rights for the week in which the disqualifying separation occurred and until the individual has earned

to include a "knowing violation of a reasonable and uniformly enforced rule of an employer . . . ."

[19] Employee contends that he did not neglect Client D and was not discharged for just cause. He points to evidence that he attempted to contact his supervisor immediately, that when his supervisor called him back the question to him was whether he had gotten the other two clients out safely, he was told the supervisor was sending help, no directions were given to him to remove Client D from the car or to call the police, the supervisor did not call the police, and that another staff person arrived twenty-two minutes later. He argues the car door was not locked, Client D was constantly pushing the door open, two doors could always be opened from inside the car whether a key was in the door or not, Client D was provided fresh air and water, Employee continued to supervise Client D for his own safety until the help arrived that his immediate supervisor said was coming, and this constituted restraint until assistance arrived. Employee further asserts that the ALJ interjected calling the police into the record and that this was not a reason for which his employment was terminated. He also argues that Employee's supervisor knew that two clients were removed from the car and that Client D was still restrained in the car, that the supervisor did not direct Employee to remove Client D from the car, to

remuneration in employment equal to or exceeding the weekly benefit amount of the individual's claim in each of eight (8) weeks.

Ind. Code § 22-4-15-1 (subsequently amended by Pub. L. No. 121-2014, § 12 (eff. Jul. 1, 2014)) (emphasis added).

attempt Mandt techniques on Client D, or to call the police, and that thus the supervisor was negligent of Employer's rule and the rule was not uniformly enforced.

[20] The Board and Employer maintain that, besides calling the police, Employee could have placed Client D in a Mandt hold. The Board also contends that the rule prohibiting neglect was uniformly enforced and that a classification that places direct care professionals and their supervisors in the same class would unreasonably collapse the meaningful distinction between direct care professionals and their supervisors.

[21] Employer asserted that it fired Employee for a knowing violation of a reasonable and uniformly enforced work rule; therefore, we limit our analysis to that issue and do not consider other grounds for Employee's discharge. *See Coleman v. Review Bd. of Ind. Dep't of Workforce Dev.*, 905 N.E.2d 1015, 1019 (Ind. Ct. App. 2009). The employer bears the initial burden of establishing that an employee was terminated for just cause.[2] *Id.* at 1019-1020. To establish a *prima facie* case for just cause discharge for violation of an employer rule, the employer has to show that the claimant: (1) knowingly violated; (2) a reasonable; and (3) uniformly enforced rule. *Id.* at 1020 (citing *Stanrail*, 735 N.E.2d at 1203). To have knowingly violated an employer's rules, the

---

[2] Ind. Code § 22-4-1-2(c), which became effective on July 1, 2014, provides that "[a]n applicant's entitlement to unemployment benefits is determined based on the information that is available without regard to a burden of proof." This provision was not in effect at the time of Employer's termination of Employee's employment. Pub. L. No. 121-2014, § 5 (eff. Jul. 1, 2014) (enacting Ind. Code § 22-4-1-2).

employee must: (1) know of the rule; and (2) know his conduct violated the rule. *Stanrail*, 735 N.E.2d at 1203. If an employer meets this burden, the claimant must present evidence to rebut the employer's *prima facie* showing. *Coleman*, 905 N.E.2d at 1020; *Stanrail*, 735 N.E.2d at 1203. The reason for requiring uniform enforcement of a known and reasonable rule is to give notice to employees about what punishment they can reasonably anticipate if they violate the rule and to protect employees against arbitrary enforcement. *Coleman*, 905 N.E.2d at 1020.

[22] A uniformly enforced rule is one that is carried out in such a way that all persons under the same conditions and in the same circumstances are treated alike. *Gen. Motors Corp. v. Review Bd. of Ind. Dep't of Workforce Dev.*, 671 N.E.2d 493, 498 (Ind. Ct. App. 1996). In order to evaluate uniformity one must first define the class of persons against whom uniformity is measured. *Stanrail*, 735 N.E.2d at 1203. Also, an employer's asserted work rule must be reduced to writing and introduced into evidence to enable this court to fairly and reasonably review the determination that an employee was discharged for "just cause" for the knowing violation of a rule. *Id.* at 1205 (citation omitted).

[23] In its disciplinary report, Employer indicated that its reason for terminating the employment of Employee was violation of company rules, and Employer stated that Employee violated Paragraph A of its professional conduct policy as well as statements in the written job description for direct support professionals. As to Employer's argument that Employee's actions violated Client D's BSP, we observe that Employer does not point to the record to show that it introduced

an approved BSP for Client D or that Employee stipulated to the contents of Client D's approved BSP at the hearing.[3] Thus, we cannot determine which provisions of Client D's approved BSP Employer believed Employee failed to follow, were knowingly violated by Employee, or may have provided a basis for Employer's decision to terminate Employee's employment.

[24] We turn to the professional conduct rule of Employer providing that employees "will in no way exploit, neglect or inflict physical or psychological harm on a client." Exhibits at 18. To have knowingly violated an employer's rules, the employee must know his conduct violated the rule. *Stanrail*, 735 N.E.2d at 1203.

[25] Employer and the Board emphasize that Employee did not call the police and did not perform a Mandt hold. Employer did not present evidence that Employee was required to call the police, and Employee testified that Employer had "no documentation on . . . using the police either way." Transcript at 33. While Employee may have had the option of calling the police after pulling to the side of the road, and although situations can arise which would require a reasonable employee to call the police, the focus with respect to Employee's application for unemployment benefits is on whether the actions or inactions taken by Employee under the circumstances arising on May 7, 2014, constituted a knowing violation of Employer's rule against neglect of a client.

---

[3] At the hearing, when asked if he knowingly failed to follow Client D's BSP, Employee testified: "No, I did not fail to follow it." Transcript at 26.

Moreover, Employer's disciplinary report did not state that Employee was discharged because he failed to call the police; rather it states that Employee neglected to follow Client D's BSP or "to implement MANDT de-escalation techniques . . . ." Exhibits at 37. Further, although Employer argues that Employee "should have removed the client from the vehicle and utilized a physical restraint," Appellee Employer's Brief at 8, it did not submit any document related to a Mandt hold or restraint, the circumstances under which such a restraint would be appropriate, or the length of time such a restraint was to be used, and specifically as to Client D, would have been safe or appropriate. Employee testified a Mandt hold cannot be used longer than three minutes, and Employer does not point to the record to show it responded to this testimony or presented specific evidence that it would have been safe for Client D and the other two clients for Employee to place Client D in a Mandt hold until Gatewood arrived at the scene. In addition, we note, similar to the option of calling the police, that while Employee may have had the option of placing Client D in a Mandt hold for some period, the focus with respect to Employee's application for unemployment benefits is on whether Employee's actions or inactions under these particular circumstances establish that he knowingly violated Employer's rule against neglect of clients. *See Stanrail*, 735 N.E.2d at 1203. We thus turn to whether the evidence establishes that Employee knowingly violated Employer's rule as to neglect of a client.

[26] The record reveals that Employee was driving with three clients in his vehicle when Client D began to yell, beat his chest with his fists, and state that he

would fight. Employee knew based on his experiences with Client D that "when he gets to this stage, he will start to hit people." Transcript at 20. Client D was a flight risk and had a history of physical aggression, and another of the clients with Employee was also a flight risk. Client D had "punched [Employee] in the face and then bit [him] in the back" on a previous occasion in 2012. *Id.* at 22. Client D had started to yell at approximately 2:24 p.m., and Employee pulled the vehicle to the side of the road at 2:25 p.m. Employee pulled the vehicle over near a busy intersection, had two of the clients exit the vehicle, and required Client D to remain inside the vehicle. Employee called supervisors at 2:25 p.m. and 2:26 p.m. and was unable to reach them. He then called a co-worker who was able to contact a supervisor, and the supervisor called him at 2:38 p.m. and asked "did you get the other two out safely," Employee responded affirmatively, and the supervisor said "I'll send help." *Id.* at 20. There is no indication that Employee's supervisor directed Employee to remove Client D from the car, to hold Client D in a Mandt hold, to call police, or to take any other action, nor did the supervisor contact the police.

[27] Employee gave water to Client D and allowed him to open and close the car door so that he had fresh air. Employee was the sole employee present with Client D and the two other clients until Gatewood arrived at 3:00 p.m. If Employee had Client D exit the car and attempted to hold him in a Mandt hold, it is possible that Employee would have been compelled to try to continue to physically restrain him until 3:00 p.m. when Gatewood arrived, something Employee was physically unable to do. Employee was required to supervise

Client D as well as the other two clients, one of whom was also a flight risk. Employee testified that Client D was "[a]bout five, five six" and weighed "[b]etween a hundred and seventy-five to maybe a hundred and eighty-five." *Id.* at 20. When asked if he knew that physically restraining Client D was an option, Employee replied that he was "five foot four, sixty-two years old" and "could not physically do it." *Id.* at 26. Employee also testified that a Mandt hold could not be used longer than three minutes, that using the Mandt hold on Client D would have endangered the other two clients, that the last time he was involved in a physical restraint of Client D "it took two people to physically restrain him," "it was all both of us could do is to hold him," and that if Client D were able to run away he "would never been able to keep up" as Employee could not "run any longer." *Id.* at 26-27.

[28]   We conclude that the record lacks substantial evidence to support a finding that Employee knew that his conduct violated Employer's professional conduct rule that employees "in no way exploit, neglect or inflict physical or psychological harm on a client." Exhibits at 18. The record does not establish Employee knew or could be charged with the knowledge or reasonably anticipate that his action to restrain Client D in the vehicle under the circumstances could result in the termination of his employment. We reverse the decision of the Board that Employee was terminated for just cause and denying Employee unemployment benefits and remand for further proceedings consistent with this opinion.

## *Conclusion*

[29] For the foregoing reasons, we reverse the Board's decision and remand for further proceedings consistent with this opinion.

[30] Reversed and remanded.

Crone, J., and Pyle, J., concur.