## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 14 2017, 10:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Kathrine J. Rybak
Evansville, Indiana

Adam E. Taylor
South Bend, Indiana

ATTORNEYS FOR APPELLEES

Curtis T. Hill, Jr.
Attorney General of Indiana

Andrea E. Rahman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| J.G.,<br><br>*Appellant-Petitioner,*<br><br>v.<br><br>Review Board of the Indiana Department of Workforce Development and Morgan Graham, Inc.,<br><br>*Appellee-Respondent.* | February 14, 2017<br><br>Court of Appeals Case No. 93A02-1607-EX-1579<br><br>Appeal from the Review Board of the Indiana Department of Workforce Development<br><br>The Honorable Steven F. Bier, Chairperson<br><br>Case No. 16-R-797 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Petitioner, J.G., appeals the decision reached by Appellee-Respondent, the Review Board of the Indiana Department of Workforce Development (Review Board), that J.G. was discharged for just cause and therefore should be denied unemployment compensation benefits.

We affirm.

# ISSUE

J.G. raises four issues which we consolidate and restate as the following single issue: Whether there is sufficient evidence to support the Review Board's decision that J.G. was discharged for just cause because she knowingly violated three reasonable and uniformly enforced workplace rules by failing to supervise a client at all times.

# FACTS AND PROCEDURAL HISTORY

J.G. was employed as a caregiver by Morgan Graham, Inc. d/b/a/Around the Clock Care (Employer) from April 2013 until she was terminated on December 9, 2015. Employer provides non-medical attendant care to individuals in facilities and in their homes. On December 6, 2015, J.G. was working in the home of a client who required a specific protocol to protect her and her husband, who was also residing in the residence. The client's husband suffered from chronic obstructive pulmonary disease and used oxygen. A hospice nurse, employed by a different agency, provided care to him; the hospice nurse did not have any healthcare responsibilities towards Employer's client. Employer's

client suffered from dementia and had a smoking habit. Due to the client's husband's oxygen tank, a strict protocol was in place that placed client under constant supervision. The client was not restricted in her ability to move about the home.

That day, there was little food in the house. Client's husband requested J.G. to pick up some food at a specific restaurant. The hospice nurse, who was at the residence to provide care to client's husband, agreed to remain in the house until J.G. returned. J.G. did not notify Employer prior to leaving the house. When J.G. returned to the home after approximately twenty minutes, the hospice nurse was on the phone attempting to fill a prescription order for client's husband.

Employer discharged J.G., citing a violation of the following workplace rules included in the employee handbook:

> The Company has determined that the following (although not exhaustive) are, by their very nature activities so harmful to the successful operation of any business that involvement may be grounds for immediate dismissal, disciplinary action and/or legal consequences to remedy:
>
> 1. Negligence, carelessness, or acts which result, or could result in damage to Around the Clock Care or client property or equipment, or defying the authority of supervision, or other displays of conduct that harm or injure operations or jeopardize the successful operation of Around the Clock Care.
>
> * * * *

10.  Refusal or failure to perform work assigned, or refusal or failure to follow the direction or instructions of supervisors, unless such assignment is later established to have been a violation of Around the Clock Care policy, or constitutes a safety hazard.

\* \* \* \*

14.  Being absent from work area without authorization, loitering in work areas or departments, distracting or interfering with another employee's work duties.

\* \* \* \*

19.  Any other action deemed not in the best interest of the Company.

(Appellant's App. Vol. II, pp. 9, 10, 11).  J.G. was aware of these rules of conduct as she had received a copy of the employee handbook on April 23, 2013.

On December 21, 2015, J.G. filed her claim for unemployment benefits.  On January 28, 2016, a claims deputy with the Department of Workforce Development concluded that J.G. was discharged for just cause and was not entitled to unemployment benefits.  On February 5, 2016, J.G. appealed this decision.

On May 9, 2016, an Administrative Law Judge (ALJ) conducted a hearing regarding J.G.'s appeal.  The ALJ affirmed the deputy's determination that J.G. was discharged with just cause for knowingly violating reasonable and

uniformly enforced workplace rules numbers 1, 10, and 14. On May 25, 2016, J.G. appealed the ALJ's decision to the Review Board. After reviewing the ALJ's findings of fact and conclusions of law, the Review Board affirmed the ALJ's decision that J.G. was discharged for just cause:

> [J.G.] demonstrated significant poor judgment amounting to carelessness or negligence in leaving the client in the home with the belief that a non-employee would perform [J.G.'s] supervisory responsibilities for the client. It was not reasonable for [J.G.] to expect or believe that the hospice nurse would be able to provide constant supervision of the [] client if she was distracted on the telephone attempting to get prescriptions filled, [J.G.] did not act in a reasonable manner when she failed to make any attempt to contact the [E]mployer before leaving the client without direct supervision by a company employee for approximately 20 minutes.

(Appellant's App. Vol. II, p. 8).

[9] J.G. now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[10] J.G. contends that she did not knowingly violate her Employer's workplace rules and therefore could not be discharged with good cause. The Indiana Unemployment Compensation Act provides that any decision of the Review Board shall be conclusive and binding as to all questions of fact. Ind. Code § 22-4-17-12(a). When the Review Board's decision is challenged as being contrary to law, our review is limited to a two-part inquiry: "(1) the sufficiency of the facts found to sustain the decision; and (2) the sufficiency of the evidence

to sustain the findings of fact." *Albright v. Review Bd. of Ind. Dep't of Workforce Dev.*, 994 N.E.2d 745, 749 (Ind. Ct. App. 2013). Applying this standard, we review "(1) determinations of specific or basic underlying facts, (2) conclusions or inferences from those facts, sometimes called 'ultimate facts,' and (3) conclusions of law." *Id.* at 750. The Review Board's findings of basic fact are subject to a substantial evidence standard of review. *Id.* The Review Board's conclusions regarding ultimate facts involve an inference or deduction based on the findings of basic fact, and we typically review them to ensure that the Review Board's inference is "reasonable" or "reasonable in light of its findings." *Id.* We review the Review Board's conclusions of law using a *de novo* standard. *Id.* In conducting our analysis, we neither reweigh evidence nor judge witness credibility; rather, we consider only the evidence most favorable to the Review Board's findings. *Id.*

[11] In Indiana, an employee is ineligible for unemployment benefits if he or she is discharged for just cause. I.C. § 22-4-15-1. "Discharge for just cause" is defined to include "a knowing violation of a reasonable and uniformly enforced rule of an employer[.]" I.C. § 22-4-15-1(d). "An applicant's entitlement to unemployment benefits is determined based on the information that is available without regard to a burden of proof." I.C. § 22-1-1-2(c). "There is no presumption of entitlement or nonentitlement to unemployment benefits." I.C. § 22-4-1-2(d). Although the employer has no statutory burden of proof, case law has divided Indiana Code section 22-4-15-1(d)(2) into three main parts "to show that the claimant: (1) knowingly violated; (2) a reasonable; and (3)

uniformly enforced rule." *City of Carmel v. Review Bd. of Ind. Dep't of Workforce Dev.*, 970 N.E.2d 239, 245 (Ind. Ct. App. 2014). The reason for requiring uniform enforcement of a known and reasonable rule is to give notice to employees about what punishment they can reasonably anticipate if they violate the rule and to protect employees against arbitrary enforcement. *Coleman v. Review Bd. of Ind. Dep't of Workforce Dev.*, 905 N.E.2d 1015, 1020 (Ind. Ct. App. 2009). We will address each component in turn.

## I. *Reasonable Rules*

The ALJ and the Review Board concluded that J.G. violated workplace rules 1, 10, and 14 of the employee handbook. The determination of whether a workplace rule is reasonable is a question of ultimate fact and deference should be given to the Review Board's conclusion. *See McClain v. Review Bd. of Ind. Dep't of Workforce Dev.*, 693 N.E.2d 1314, 1318 (Ind. 1998) ("An example of such an ultimate fact would be whether the workplace rule is reasonable"). A work rule is reasonable "if it protects the interests of the employees as well as those of the employer." *Russell v. Review Bd. of Ind. Dep't of Employment & Training Servs*, 586 N.E.2d 942, 949 (Ind. Ct. App. 1992).

With respect to the reasonableness of the workplace rules, J.G. only challenges workplace rule 14, which states that "[b]eing absent from work area without authorization, loitering in work areas or departments, distracting or interfering with another employee's work duties" may be grounds for immediate dismissal. (Appellant's App. Vol. II, p. 10). The ALJ, as affirmed by the Review Board,

concluded that "the [E]mployer's rules were reasonable in so far as an employer has a legitimate business interest in preventing carelessness or negligent acts by employees, insuring that employees perform their assigned work and that employees remain in their assigned work area unless authorized to leave." (Appellant's App. Vol. II, p. 8). J.G. now contends that the Employer's interpretation and application of rule 14, in light of the Employer's instruction to maintain constant supervision of the client, is unreasonable. Specifically, she asserts that "a rule prohibiting J.G. from running a client-requested errand for the client's welfare is unreasonable. Such a rule does not make sense considering Employer's business needs." (Appellant's Br. p. 19).

[14] Employer is in the business of assigning caregivers to provide non-medical attendant care. The specific instructions to be followed by each caregiver will therefore depend on the unique needs of the client. Here, the record reflects that J.G. had been instructed by Employer's client care instruction coordinator to constantly supervise client because of a safety concern. Both client and her husband wanted to smoke in the house although client's husband was required to use liquid oxygen due to a health condition. As testified to by Employer: "[A]nyone who is aware of how liquid oxygen and a lighter and fire relate to each other, you know that that is a perilous situation." (Transcript p. 18). Because client suffered from dementia, Employer had devised specific "protocols" to maintain the safety of everyone in the residence. (Tr. p. 18). One of these protocols was the constant supervision of client by the assigned caregiver.

[15] The record supports, and J.G. admitted during testimony, that she left the house to pick up food for the client and the client's husband. However, contrary to J.G.'s argument, on December 6, 2015, J.G. did not run a "client-requested errand." (Appellant's Br. p. 19). Our review of the record indicates that it was client's husband—not client herself—that requested J.G. to pick up food from a local restaurant. Moreover, Employer testified that the company employed "a hired helper who, if we needed anything outside of the home, and to this day, it's still policy, we can call her and she will go pick up groceries, food. She'll even – would take people on assist with errands running, that type of thing." (Tr. p. 19). Even if a caregiver had to leave the home, the Employer required the caregiver "to contact the office and stipulate to us why they feel they need to leave and they know they are given direct instructions that you never leave a shift and you never leave a client alone until you have somebody to relieve you. . . . They don't do it without notification to the office, nor in this case, was it necessary for her to leave." (Tr. p. 17). Even though a hospice nurse was in the house, the hospice nurse was not employed by Employer, nor did she have any supervisory duties over client. J.G. never contacted the office or the hired helper prior to leaving the client and the residence.

[16] Accordingly, due to client's unique circumstances and in light of Employer's business, it was reasonable to prohibit J.G. from "[b]eing absent from work area without authorization." (Appellant's App. Vol. II, p. 10)

## II. *Uniform Enforcement*

The ALJ, as affirmed by the Review Board, concluded that

> the [E]mployer had policies which represented rules in so far as they placed employees on notice of what would be considered unacceptable behavior and because, at least with respect to rule numbers 1, 10, and 14, were capable of being uniformly enforced. [] Further, the [ALJ] concludes that the [E]mployer's rules were uniformly enforced in so far as all employees found to be in violation of such rules by the [E]mployer have been terminated.

(Appellant's App. Vol. II, p. 8).

A uniformly enforced rule is one that is carried out in such a way that all persons under the same conditions and in the same circumstances are treated alike. *Gen. Motors Corp. v. Review Bd. of Ind. Dep't of Workforce Dev.,* 671 N.E.2d 493, 498 (Ind. Ct. App. 1996). "In order to evaluate uniformity one must first define the class of persons against whom uniformity is measured." *Stanrail Corp. v. Review Bd. of Dep't of Workforce Dev.,* 735 N.E.2d 1197, 1203 (Ind. Ct. App. 2000). "Once the class is defined, the question whether the employer treats the persons within the class consistently is a basic factual inquiry and is reviewed subject to the substantial evidence test and for conformity to law." *McClain,* 693 N.E.2d at 1319.

Employer testified that in the past other employees have "been found in violation of these same rules that the [E]mployer felt that [J.G.] violated." (Tr. p. 16). She confirmed that all employees in that situation "have been terminated." (Tr. p. 16). "These rules [applied] to all employees of the company." (Tr. p. 16). *See McClain,* 693 N.E.2d at 1319 (testimony by the

supervisor and employer's representative that "it was standard practice to discharge employees who violated the timecard policy" was substantial evidence to show that the policy was uniformly enforced).

[20]  J.G. now focuses her argument that the rules are not uniformly enforced on the language of the workplace rules, which state that a violation "*may*" subject the employee to discharge." (Appellant's App. Vol. II, p. 9) (emphasis added). In this light, she refers to Employer's testimony that a violation could lead to "ramifications up to and including termination." (Tr. p. 16). Accordingly, she maintains that "Employer has unbridled discretion to determine the consequences of violating the applicable Rules of Conduct." (Appellant's Br. p. 18). However, in *Albright*, we held that no arbitrary enforcement exists when a rule provides that discharge was a possible consequence of a violation of the workplace attendance policy, the employee knew about the rule, and she knowingly violated the rule. *Albright*, 994 N.E.2d at 751-52.

[21]  Furthermore, J.G.'s mere assertion that she had "performed similar errands previously, without specific Employer approval, and [] [without being] reprimanded or disciplined for this," does not establish that Employer had been aware of this and had condoned the behavior. (Appellant's Br. p. 18). Rather, the Employer's testimony was unequivocal that similar employees in similar circumstances had previously been terminated. Therefore, the ALJ and the Review Board properly concluded that the workplace rules were uniformly enforced.

## III. *A Knowing Violation*

To have knowingly violated an employer's rule, the employee must know of the rule and must know that his conduct violated the rule. *Stanrail Corp.*, 735 N.E.2d at 1203. The Review Board must make a finding as to whether an employee knew that his conduct violated an employer rule because the text of Indiana Code Section 22-4-15-1(d)(2) requires a "knowing violation" of a rule rather than merely a violation of a known rule. *Id.*

The Employer presented evidence that J.G. had received a copy of the employee handbook which included the workplace rules 1, 10, and 14. J.G. testified that she knew and understood that the client could never be left unsupervised due to safety concerns. "J.G. does not dispute that leaving a client alone and unsupervised would have been a breach of the Employer's rule." (Appellant's Br. p. 15). Rather, she alleges that the meaning of the Employer's requirement for constant supervision, and the interpretation of that requirement within the meaning of rules 1, 10, and 14 was not specific enough to be clearly understood and therefore, she was unaware that the behavior violated the rule. In essence, J.G.'s entire argument amounts to the fact that client was not left alone when J.G. left the residence to purchase food because the hospice nurse was present to provide supervision.

J.G. likens her situation to *Reed v. Review Bd. of Ind. Dep't of Workforce Dev.*, 32 N.E.3d 814 (Ind. Ct. App. 2015). Reed was a direct support professional and provided support and assistance to individuals with developmental disabilities.

*Id*. at 816.  While driving three clients back to his Employer's location after visiting a park, one of the clients began to yell and beat his chest.  *Id*. at 817.  Reed pulled the vehicle to the side of the road and had the two other clients exit the vehicle.  *Id*.  He then called his supervisor who asked if the clients were out of the car safely and who stated that she would send help.  *Id*.  Reed was terminated for violating the rule that "Employees [] will in no way exploit, neglect or inflict physical or psychological harm on a client."  *Id*.  The Employer emphasized that Reed should have called the police and placed the client in a "Mandt hold."  *Id*. at 824.  Upon review, this court held that Reed did not knowingly violate the rule because the "Employer did not present evidence that [Reed] was required to call the police, and [Reed] testified that Employer had 'no documentation on . . . using the police either way."  *Id*.  Neither did we find that Employer had submitted any document related to a Mandt hold or restraint, "the circumstances under which such a restraint would be appropriate, or the length of time such a restraint was to be used[.]"  *Id*.  Accordingly, we concluded "that the record lacks substantial evidence to support a finding that [Reed] knew his conduct violated Employer's professional conduct rule."  *Id*. at 825.

We find *Reed* inapposite to the situation at hand.  Unlike J.G., Reed called his supervisor to receive instructions on how to handle the volatile situation.  Furthermore, while J.G. recognized Employer's work rules and the need for constant supervision, Reed had never been informed that the situation should have been handled by calling the police and placing the client in a restraint.

[26]     There is ample evidence in the record to support J.G.'s knowing violation of the workplace rule. J.G. had received a copy of the handbook and knew of the workplace rules instructing her of the consequences by failing to perform the work assigned and being absent from the work area. When questioned whether the client "was ever supposed to be left alone," in contravention of the specific protocol in place, she replied, "Oh no [] [b]ecause we didn't want her lighting up cigarettes around the oxygen, and if it wasn't for the oxygen, we still didn't leave her alone." (Tr. p. 39). J.G. also understood that client's husband was "with hospice [] [and we] weren't supposed to care for him." (Tr. p. 39). While J.G. claims she did not know she was required to contact her Employer if she needed to leave the house, she did acknowledge the importance of constant supervision.

[27]     J.G. left her client to run an errand for client's husband—for whom J.G. had no responsibilities—and as such, she left "the work area" and "fail[ed] to perform work assigned." (Appellant's App. Vol II, pp. 9, 10). Although the hospice nurse was present in the residence while J.G. ran the errand, the hospice nurse was not employed by Employer, nor did she have any responsibility to supervise Employer's client. As recognized properly by the ALJ and the Review Board, "[J.G.] demonstrated poor judgment amounting to carelessness or negligence in leaving the client in the home with the belief that a non-employee would perform the claimant's supervisory responsibilities to the client." (Appellant's App. Vol. II, p. 8). We affirm the Review Board's conclusion that J.G. knowingly violated Employer's workplace rules.

# CONCLUSION

[28] Based on the foregoing, we conclude that there is substantial evidence to establish that J.G. was discharged for just cause and is therefore ineligible for unemployment compensation benefits.

[29] Affirmed.

[30] Crone, J. and Altice, J. concur